UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

FEDERAL TRADE COMMISSION,

     Plaintiff,

     v.

GLOBAL COMMUNITY INNOVATIONS LLC, a
limited liability company;

INNOVATED HEALTH LLC, a limited liability
company, also d/b/a INNOVATIVE HEALTH;

EMERGING NUTRITION INC., a corporation;

PREMIUM HEALTH SUPPLIES, LLC, a limited
liability company;

BUDDHA MY BREAD LLC, a limited liability
company;

INNOVATED FULFILLMENT LLC, a limited
liability company;

SHIP SMART LLC, a limited liability company,
also d/b/a JETPACK or JETPACK
FULFILLMENT;

VISTA MEDIA LLC, a limited liability company;

ASH ABBAS LLC, a limited liability company;

Case No. _____

**COMPLAINT FOR PERMANENT
INJUNCTION AND OTHER
EQUITABLE RELIEF**

DCT MARKETING, INC., a corporation;

RNA ENTERPRISE, INC., a corporation;

ROS MARKETING & CONSULTING LLC, a limited liability company;

FRED RICHARD GUERRA, III, individually and as an officer or member of GLOBAL COMMUNITY INNOVATIONS LLC, INNOVATED HEALTH LLC, also d/b/a INNOVATIVE HEALTH, EMERGING NUTRITION INC., PREMIUM HEALTH SUPPLIES, LLC, BUDDHA MY BREAD LLC, INNOVATED FULFILLMENT LLC, SHIP SMART LLC, also d/b/a JETPACK and JETPACK FULFILLMENT, VISTA MEDIA LLC, and ASH ABBAS LLC;

LANTY PAUL GRAY, JR., a/k/a Lanty Paul, individually and as an officer or member of DCT MARKETING, INC., INNOVATED HEALTH LLC, also d/b/a INNOVATIVE HEALTH, EMERGING NUTRITION INC., PREMIUM HEALTH SUPPLIES, LLC, BUDDHA MY BREAD LLC, INNOVATED FULFILLMENT LLC, SHIP SMART LLC, also d/b/a JETPACK and JETPACK FULFILLMENT, and ASH ABBAS LLC;

RAFAT ABBAS, a/k/a Rafot Abbas, individually and as an officer or member of RNA ENTERPRISE, INC., INNOVATED HEALTH LLC, also d/b/a INNOVATIVE HEALTH, EMERGING NUTRITION INC., PREMIUM HEALTH SUPPLIES, LLC, BUDDHA MY BREAD LLC, INNOVATED FULFILLMENT LLC, SHIP SMART LLC, also d/b/a JETPACK and JETPACK FULFILLMENT, and ASH ABBAS LLC; and

ROBBY O. SALAHEDDINE, individually and as an officer or member of ROS MARKETING & CONSULTING, LLC, EMERGING NUTRITION LLC, and PREMIUM HEALTH SUPPLIES, LLC,

Defendants.

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, in connection with Defendants' marketing and sale of purported cognitive enhancement products.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 52, and 53(b).

3.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces Section 12 of the FTC Act, 15 U.S.C. § 52, which prohibits false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.

5. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. § 53(b) and 56(a)(2)(A).

## DEFENDANTS

*Merchants*

6. Defendant Global Community Innovations LLC ("GCI") was an Ohio limited liability company from March 28, 2011, until it dissolved on or about April 1, 2016. Prior to its dissolution, GCI's principal place of business was at 3416 Keyser Parkway, Cuyahoga Falls, Ohio 44223. GCI transacts or has transacted business in this district and throughout the United States.

7. Defendant Innovated Health LLC, also d/b/a Innovative Health ("Innovated Health"), was an Ohio limited liability company from January 9, 2014, until it dissolved on or about July 1, 2015. Prior to its dissolution, Innovated Health's principal place of business was at 3416 Keyser Parkway, Cuyahoga Falls, Ohio 44223. Innovated Health transacts or has transacted business in this district and throughout the United States.

8. Defendant Emerging Nutrition Inc. ("Emerging Nutrition") is an Ohio corporation with its principal place of business at 1690 East Avenue, Akron, Ohio 44314. Emerging Nutrition has also conducted business at 2241 Front Street, Suite B, Cuyahoga Falls, Ohio 44221. Emerging Nutrition transacts or has transacted business in this district and throughout the United States.

9. Defendant Premium Health Supplies, LLC ("PHS") is an Ohio limited liability company with its principal place of business at 339 South Miller Road, Akron, Ohio 44333.

PHS has also conducted business at 2241 Front Street, Suite B, Cuyahoga Falls, Ohio 44221, and P.O. Box 192, Cuyahoga Falls, Ohio 44222.  PHS transacts or has transacted business in this district and throughout the United States.

### Advertising Services Company

10.     Buddha My Bread LLC ("Buddha") is an Ohio limited liability company with its principal place of business at 1690 East Avenue, Akron, Ohio 44314.  Buddha transacts or has transacted business in this district and throughout the United States.

### Fulfillment Companies

11.     Innovated Fulfillment LLC ("Innovated Fulfillment") was an Ohio limited liability company from May 4, 2014, until its dissolution on or about July 1, 2015.  Until its dissolution, Innovated Fulfillment's principal place of business was at 113 Tyler Avenue, Cuyahoga Falls, Ohio 44221.  Innovated Fulfillment has also conducted business at 4704 Darrow Road, Suite 4, Stow, Ohio 44224.  Innovated Fulfillment transacts or has transacted business in this district and throughout the United States.

12.     Ship Smart LLC, also d/b/a Jetpack or Jetpack Fulfillment ("Ship Smart"), is an Ohio limited liability company with its principal place of business at 322 Shenandoah Boulevard, Barberton, Ohio 44203.  Ship Smart has also conducted business at 6100 Oak Tree Boulevard, Independence, Ohio 44131, and 3420 Cavalier Trail, Suite E, Cuyahoga Falls, Ohio 44224.

### Payment Processor

13.     Ash Abbas LLC is an Ohio limited liability company with its principal place of business at 322 Shenandoah Boulevard, Barberton, Ohio 44203.  Ash Abbas LLC has also conducted business at 3967 West Market Street, Suite 119, Akron, Ohio 44333.  Ash Abbas LLC transacts or has transacted business in this district and throughout the United States.

4

*Holding Companies*

14.     Vista Media LLC ("Vista Media") is an Ohio limited liability company with its principal place of business at 3416 Keyser Parkway, Cuyahoga Falls, Ohio 44223.  Vista Media transacts or has transacted business in this district and throughout the United States.

15.     DCT Marketing, Inc. ("DCT") is an Ohio corporation with its principal place of business at 1684 East Avenue, Akron, Ohio 44314.  DCT has also conducted business at 2639 Shelburn Avenue, Akron, Ohio 44312.  DCT transacts or has transacted business in this district and throughout the United States.

16.     RNA Enterprise, Inc. ("RNA") is an Ohio corporation with its principal place of business at 322 Shenandoah Boulevard, Barberton, Ohio 44203.  RNA transacts or has transacted business in this district and throughout the United States.

17.     ROS Marketing & Consulting, LLC ("ROS") is an Ohio limited liability company with its principal place of business at 339 South Miller Road, Akron, Ohio 44333.  ROS transacts or has transacted business in this district and throughout the United States.

18.     Defendants GCI, Innovated Health, Emerging Nutrition, PHS, Buddha, Innovated Fulfillment, Ship Smart, Vista Media, Ash Abbas LLC, DCT, RNA, and ROS shall be referred to collectively as the "Corporate Defendants."

*Individual Defendants*

19.     Defendant Fred Richard Guerra, III ("Guerra") is the owner and sole member of GCI and Vista Media; either directly, or indirectly through Vista Media, an owner of Innovated Health; an owner of PHS and Innovated Fulfillment, and, since 2016, Ash Abbas LLC; and a principal of Buddha.  Through Vista Media, he is an owner of Emerging Nutrition and Ship Smart.  At all times material to this Complaint, acting alone or in concert with others, he has

formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants, including the acts and practices set forth in this Complaint.  Defendant Guerra resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

20.     Defendant Lanty Paul Gray, Jr., a/k/a Lanty Paul ("Gray"), is the owner and sole member of DCT Marketing; a principal of Buddha; and, since 2016, an owner of Ash Abbas LLC.  Through DCT Marketing, Defendant Gray is an owner of Innovated Health, Emerging Nutrition, and PHS, and a member of Innovated Fulfillment and Ship Smart.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants.  Defendant Gray resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

21.     Defendant Rafat Abbas, a/k/a Rofat Abbas ("Abbas"), is the sole owner of RNA; a principal of Buddha; and, since 2016, an owner of Ash Abbas LLC.  Through RNA, Defendant Abbas is an owner of Innovated Health, Emerging Nutrition, and PHS, and a member of Innovated Fulfillment and Ship Smart.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants.  Defendant Abbas resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

22.     Defendant Robby O. Salaheddine ("Salaheddine") is the sole owner of ROS.  Through ROS, Defendant Salaheddine is an owner of Emerging Nutrition and PHS.  On one or

more occasions, Defendant Salaheddine has held himself out as President or affiliate marketing Account Manager of Innovated Health.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants.  Defendant Salaheddine resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

## COMMON ENTERPRISE

23.     The Corporate Defendants have operated as a common enterprise while engaging in the deceptive acts and practices alleged below.  Defendants conducted the business practices described below through an interrelated network of companies that were under common control and had common ownership, officers, managers, business functions, employees, and office locations.  Because these Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.  Individual Defendants Guerra, Gray, Abbas, and Salaheddine, have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise.

## COMMERCE

24.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

25.     From approximately August 2012 until at least January 2017, through a web of corporate entities, Defendants marketed and sold via the Internet purported cognitive

enhancement dietary supplements under various brand names, including, but not limited to, Xcel, EVO, Geniux, and Ion-Z (collectively, "Geniux Products") to consumers throughout the United States.

26.     Defendants constructed their web of entities using a complicated and evolving mix of ownership, by individual Defendants Guerra, Gray, Abbas, and Salaheddine, or by those individual defendants through their various holding companies.  Although defendants Guerra, Gray, Abbas, and Salaheddine registered certain corporate entities under their own names, they also masked their involvement by utilizing other individuals to register other corporate entities that were part of the common enterprise.  Regardless of which individual registered a company, Defendants Guerra, Gray, Abbas, and Salaheddine shared profits pursuant to various informal distribution arrangements that reflected undocumented verbal agreements regarding percentages of company "ownership."

27.     Defendants Guerra, Gray, Abbas, and Salaheddine designated particular corporate entities to act as merchants, fulfillment companies, a payment processor, and an advertising services company, but these same individual defendants controlled the operations of each of the corporate entities, often from shared office locations, and with the assistance of the same employees, contractors, and others.  In addition, although individual defendants at times received profit distributions from particular corporate entities, they engaged a single payroll entity that issued regular paychecks to the individual defendants and those who assisted them without distinguishing whether the hours worked were for a particular corporate entity.

***Defendants' False and Misleading Product Claims on their Merchant Websites***

28.     Defendants marketed and sold the Geniux Products in at least five different formulations, utilizing approximately 15 different active ingredients and often in undisclosed

amounts.  Despite these differences in Geniux Product formulations, Defendants often made the same or substantially similar claims about these products in their marketing.  Defendants charged approximately $47 to $57 per bottle of Geniux Product.

29.     Defendants marketed and sold the Geniux Products through websites that they owned and operated, including, but not limited to, the Uniform Resource Locators ("URLs") trygeniux.com, try-geniux.com, getgeniux.com, geniuxmind.com, geniuxbrain.com, tryxcel.com, xcelxr.com, tryevo.com, healthyevosupplement.com, getionz.com, and ionzmind.com.

30.     To induce consumers to purchase the Geniux Products, Defendants disseminated, or caused to be disseminated, advertisements for the Geniux Products on Defendants' websites, which Defendants often referred to as "landing pages" or "landers," that included, but were not limited to, the following statements and depictions, among others:

a.     Geniux Lander Enhance Ad, Exh. A



9

(Exh. A at 1.)

\* \* \*

. . . Clinical Trials have shown that Geniux boosts brain power by up to 89.2%

[and] increases focus by up to 121% . . .

(Exh. A at 2.)

\* \* \*



CNN *(Sep 2014)* – 'Dozens of clinical tests have proven the benefits of Geniux to

enhance brain power and performance, and its [sic] received support from

celebrities like UFC commentator Joe Rogan and best-selling author Tim Ferris . .

. .'

(Exh. A at 4.)

\* \* \*

10

## HOW DOES GENIUX WORK? . . .

<u>Boost Brain Power</u> – Geniux uses a scientifically-engineered stack of maximum strength nootropics, known as 'smart drugs,' to help increase brain activity, mental performance, and vigilance.

<u>Enhance Memory Recall</u> – Simply put, Geniux "wakes up your brain" and allows you to think clearly, process data more quickly, and retain more information. Only Geniux gives you the focus and concentration you need to work smarter, work longer and get the job done.

<u>Skyrocket Concentration</u> – Geniux allows you to ignore constant distractions and focus on the task at hand.  It 'zooms you in' so you're motivated, alert, and find yourself concentrating harder and remembering more than ever before.

(Exh. A at 4-5.)

      b.   Geniux Lander Fuel Ad, Exh. B



(Exh. B at 1.)

\* \* \*

     ✓  Help conquer the pesky distraction that sabotages your ability to focus . . .

11

(Exh. B at 3.)

\* \* \*



(Exh. B at 3-4.)

c.   Geniux Lander Onyx Ad, Exh. C



(Exh. C at 1.)

\* \* \*

QUICK FACTS ABOUT YOUR BRAIN

➢ The brain begins to lose sharpness of memory from as early as 30 [years of age] . . .
➢ If you do not follow a strict brain diet or take a daily enhancer such as GENIUX[,] your brain will begin to decline in performance, causing you to rapidly lose memory and focus as you age

(Exh. C at 1.)

\* \* \*

Every day our bodies change a bit and some of our brain cells die . . . . As we age our mental health naturally declines from the daily stress we put on our brains. That is why you need GENIUX – It's [sic] one of a kind formula . . . improve[s] all areas of cognitive growth, including focus, energy, short and long term memory, problem solving capabilities, and much more.



GENIUX
Is the #1 natural cognitive enhancer that is guaranteed to noticeably improve your focus and memory within the first week as well as increase your energy levels and get rid of that feeling of mental fatigue forever!

(Exh. C at 2.)

* * *

✓ Supports cognitive performance increasing your memory recall and giving you crystal clear focus like you've never experienced before.

(Exh. C at 2.)

* * *

**Start seeing results like:**

➢ Increase in memory recall . . .

➢ Noticeably more focus

➢ Improved memory & brain

(Exh. C at 3.)

31.    Defendants' representations that the Geniux Products improve short and long term memory, increase focus, and increase concentration in users; prevent memory loss and increase

14

short and long term memory in persons experiencing cognitive decline because of age; boost

brain power, including by as much as 89.2 percent; increase users' IQ; or improve users' speed

of information processing are false and/or Defendants did not possess and rely upon a reasonable

basis to substantiate those representations.

32.     There are no human clinical studies of the Geniux Products demonstrating any

efficacy in users, including increasing focus, increasing concentration, boosting brain power,

enhancing memory recall, or increasing IQ.

33.     In some instances, Defendants' websites falsely claimed "support" from

celebrities such as UFC commentator Joe Rogan and best-selling author Tim Ferris, suggesting

that these celebrities endorsed the Geniux Products.  (Exh. A at 4.)

34.     In some instances, Defendants' websites included false "as seen on" references to

legitimate news sources like *Chicago Tribune*, CNN, *The Daily News*, NBC, *The New York

Times*, and *USA Today*, among others, implying that these news sources featured the Geniux

Products and their claimed effects.  (Exhs. A at 4 and C at 1.)

***Defendants' Affiliate Advertising Practices and Sham News Websites***

35.     From at least March 2014 until January 2017, Defendants, through third parties

known as affiliate networks, authorized entities known as affiliate marketers to disseminate

Internet and email advertisements, including websites that looked like legitimate news sites, to

lure consumers to Defendants' websites where the consumers could purchase the Geniux

Products.  These websites, which had the appearance of being news websites, were in fact

advertisements ("sham news"), with URLs like energyandfitnesshelp.com,

fitnessandenergytips.com, www.com-news.info, cmn.com--news.info, geniuxinfo.com,

usweeklynews.today, dailyenergyadvice.com, finance.yahoo.com, womensdietmag.com. Defendants often referred to these websites as advertorials.

36.     For each consumer who viewed an affiliate marketer's advertisement and then took a specific action, such as clicking through to, or making a purchase on, one of the Defendants' websites, Defendants paid a fee to the affiliate network, which in turn paid a fee to the affiliate marketer.  Defendants used at least thirty-six affiliate networks that in turn used an unknown number of affiliate marketers to advertise the Geniux Products.

37.     The sham news websites contained a number of deceptive claims about the Geniux Products, often the same as or substantially similar to the claims on Defendants' websites.  To induce consumers to purchase the Geniux Products, Defendants disseminated or caused to be disseminated advertisements for the products, including but not limited to the attached Exhibits D through F.  These advertisements contained the following statements and depictions, among others:

a.  "Reporters" featured in the "news" reports have represented that they have examined product research or tested the Geniux Products on themselves and report that Geniux improved their ability to focus, their mental function, their memory, and the speed at which they could process new information.  For example a "CNN" advertorial, which appeared at URLs including www.com--news.info/cmn/brain/**hawking**2/, claimed that CNN reporter Anderson Cooper allegedly took Geniux for a fourteen-day trial, reporting that "Geniux is the real deal.  The increase in focus, creativity and overall mental performance was a little bit scary to be honest – I felt like a different person."  (Exh. E at 3.)

b.  The CNN advertorial featured claims that Geniux "doubles IQ," "increases IQ . . . Up to 100%," can "effortlessly boost IQ," and is "THE best treatment available to . . . boost overall IQ."  (Exh. E at 1.)  The Discover advertorial (which appeared at URLs including fitnessandenergytips.com/brain/**discover**) similarly claimed that Geniux caused users to "**double their IQ**."  (Exh. F at 1 (emphasis in original).)

c.  The Smart Stuff advertorial (which appeared at URLs including http://energyandfitnesshelp.com/brain/**smartstuff**) and the Discover advertorial both featured claims that "[Geniux] boosts brain power by up to 89.2%, sharpens your mind and sky-rockets your energy levels."  (Exh. D at 1 and Exh. F at 1.)

38.  In some instances, the sham news sites claimed that the Geniux Products could increase focus, including by as much as 300 percent.  The sites also claimed that Geniux Products have been clinically proven to increase concentration, boost brain power, and enhance memory recall.  For example:

a.  The CNN advertorial initially claimed that "[a]fter 7 years Harvard Scientists Finally Break New Ground . . . With Invention of Smart Drug [Geniux] That Increases . . . Focus Up to %100 [sic]."  (Exh. E at 1.)  The advertorial later included a "STORY UPDATE" that claimed that "CNN broke the news first and uncovered that Geniux raises levels of focus and performance every day by 300%."  (Exh. E at 2.)

b.  The Smart Stuff, CNN, and Discover advertorials claimed that the Geniux Products were clinically proven to increase concentration (Exh. D at 3), and to do so by 32 percent (Exh. E at 3) and by 312 percent (Exh. F at 3).

c. The CNN and Discover advertorials claimed that clinical trials or studies proved that the Geniux Products "boost brain power by up to 89.2%." (Exh. D at 1 and Exh. F at 1.) The Smart Stuff advertorial also claimed that "This clinically proven supplement Geniux™ is shown to boost brain activity." (Exh. D at 2.)

d. The Smart Stuff, CNN, and Discover advertorials claimed that the Geniux Products were clinically proven to "enhance memory recall." (Exh. D at 3, Exh. E at 3, and Exh. F at 3.)

39. The Geniux Products neither increase focus by 100% or 300% nor increase IQ, including by as much as 100%. Nor do Defendants possess and rely upon a reasonable basis to substantiate these representations. Moreover, clinical tests do not prove that the Geniux Products: increase concentration, including by 32% or 312%; boost brain power, including by up to 89.2%; or enhance memory recall.

40. In some instances, the sham news websites falsely claimed that the Geniux Products have been tested in human clinical trials, including over 2,000 trials conducted by the Nottingham Clinical Trials Unit (NCTU). For example:

a. The Discover advertorial and the Smart Stuff advertorial both claimed, "After several years and over 2000 trials at The Nottingham Clinical Trials Unit, Geniux pills are back in production . . . ." (Exh. D at 1 and Exh. F at 2.)

b. In a section entitled, "The Nottingham Clinical Trials Unit: Research Findings," the Discover advertorial featured an excerpt from the purported trial: "Participant #214 Case Study," which summarized a purported study subject's experiences with the Geniux Product over a four-week period, including increasing energy and ability to focus each week and concluding with a "crystal-clear" memory and

"levels of focus and concentration [that] have been through the roof!"  (Exh. F at 4.)

    c.    This same advertorial featured an image of CT scans of two brains – one scan "Before taking Geniux" and another scan "24 minutes after taking Geniux." Superimposed on the bottom of this image was "Research compliments of The Nottingham Clinical Trials Unit (NCTU)."  Accompanying the image was the claim, "'87% of students reported an increase with their grades.  Other participants had mental success with zero anxiety or the feeling of being overwhelmed in pressure situations.' – NCTU Research."  (Exh. F at 5.)

    d.    The Smart Stuff advertorial featured this identical NCTU Research quote about students' results after taking Geniux.  (Exh. D at 4.)  This claim appeared above a link to an offer with substantially similar images appearing in some of Defendants' Geniux lander pages.  (Exh. C at 1.)

41.    In fact, the Nottingham Clinical Trials Unit has not tested the Geniux Products, and the purported research results are fictitious.

42.    In some instances, the sham news websites falsely attributed alleged dramatic results or achievements to others, including celebrity scientists and entrepreneurs such as Stephen Hawking, Bill Gates, Elon Musk, and Kanye West, and suggested they endorse the Geniux Products.  For example:

    a.    The "CNN" advertorial prominently featuring Stephen Hawking's image falsely claimed, "Stephen Hawking said that his brain is sharper than ever, more clear and focused and he credits a large part to using Geniux."  (Exh. E at 1.)

b.  This same advertorial featured an image of Bill Gates and the following false endorsement:  "'The results were unbelievable.  Every aspect of my mental performance accelerated from day 1.  A must try.' – Bill Gates' Last Interview with CNN."  (Exh. E at 3.)

c.  The "Discover" advertorial falsely claimed that Scientific American reporter Gary Stix "[h]eavily praised" Geniux as "'the missing link in human evolution' in his report, 'Turbo-charging the Brain.'"  (Exh. F at 1.)

d.  The Smart Stuff advertorial falsely claimed that James Rickman, "a resident scholar at the American Enterprise Institute . . . and lead contributor to The Discovery Magazine" reported his own results from a four-week trial.  In the advertorial, Mr. Rickman claimed, "After the fourth week, my final results were amazing.  My memory is crystal-clear, and my levels of focus and concentration have been through the roof!  . . .  [M]y memory has sky rocketed. . . . ."  (Exh. D at 3.)

43.  Many of the sham news websites included false "as seen on" or "featured in" references that implied that legitimate news sources like ABC News, CNN Health, and *Men's Health*, among others, have similarly featured the Geniux Products and their claimed effects. (Exh. D at 1 and Exh. F at 1.)

44.  The Smart Stuff advertorial further falsely claimed that "Geniux$^{TM}$ was recently given honorable mention in Forbes' printed and online magazine editions as being the pill that can turn you into 'the quickest thinker on the planet.'"  (Exh. D at 2.)

45.  In some instances, these sham news websites featured consumer testimonials praising the Geniux Products or their effects.  For example:

20

a.  A reader comment posted by "Richard Klekar" claimed:  "I have been taking GENIUX daily over the past 2 weeks and have noticed a difference in my cognitive processing skills and memory, as well as my ability to attend to detail." (Exh. D at 6.)

b.  A reader comment posted by "Dan" claimed:  "After I started taking Geniux I got a promotion at work after just 3 weeks.  Three months later I'm CEO and have surpassed all my colleagues."  (Exh. E at 4.)

c.  A reader comment posted by "Michael" claimed:  "I saw this . . . a lot on the news about that student who took it and got blamed for cheating caus e [sic] it gave him an edge over everyone else . . . .  I tried [Geniux] and I'll admit, it's the best thing I've had for focus and clarity . . . ."  (Exh. F at 6.)

46.  The purported consumer testimonials promoting Defendants' Geniux Products are fake.  The consumers featured on the sites are fictitious.

47.  The sham news sites did not disclose, or did not disclose adequately, that they were paid advertisements, and they misrepresented their affiliation with the legitimate news sites cited on their websites.  Some of these sham news sites contained no disclaimer that they were advertisements and not affiliated with actual news sites.  (*See, e.g.*, Exh. E.)  Among those sham news sites that provided any disclaimers, those disclaimers were not clear and conspicuous and therefore did not change the overall impression that the sites were news sites.  For example, The Discover advertorial placed a tiny disclaimer, "ADVERTORIAL," above the heading of its fake magazine title:

21



(Exh. F at 1.)

The Discover advertorial buried another disclaimer at the very end of its advertorial, three pages

after the order link (when printed) to buy Geniux Products and one page after the end of the fake

consumer reviews:



(Exh. F at 8.)

The Smart Stuff advertorial provided similar language:

We are not affiliated in any way with CNN, WebTV, News Channel 7, ABC, NBC, MSNBC, USA Today, BBC, 60 Minutes, CBS, U.S. News or FOX. CNN, WebTV, News Channel 7, ABC, NBC, MSNBC, USA Today, BBC, 60 Minutes, CBS, U.S. News and FOX are all registered trademarks of their respective owners. All trademarks on this web site whether registered or not, are the property of their respective owners. The authors of this web site are not sponsored by or affiliated with any of the third-party trade mark or third-party registered trade mark owners, and make no representations about them, their owners, their products or services.

(Exh. D at 7.)  Although this disclaimer was accompanied by a heading in large font, 'THIS IS

AN ADVERTISEMENT AND NOT AN ACTUAL NEWS ARTICLE, BLOG, OR

CONSUMER PROTECTION UPDATE," consumers would see the heading or disclaimer only if

they had scrolled past the order link (on page 4 when printed) and past three pages of fake

consumer testimonials (pages 4 to 6).  Thus, neither the heading nor the disclaimer was clear or

conspicuous.

22

48.     Defendants had the authority to control whether or not the Geniux Products were advertised through sham news websites.  Defendants had the ultimate control over the manner in which the Geniux Products were promoted and, if necessary, could terminate their relationships with any marketers who failed to comply with their directives.  For example, Defendants prohibited affiliate marketers' use of incentives (*e.g.*, free items included with purchase) and trial offers.  In addition, Defendants approved advertisements for affiliate marketers' use and paid commissions for sales that they attributed to those advertisements.  At times, Defendants received emails from affiliate advertising networks seeking permission to use sham news advertising, as well as copies of ads deceptively formatted as news articles that the networks recommended using because they were successful.  Defendants would repurpose such ads to use to sell the Geniux Products.

49.     Defendants had knowledge of the sham news websites (advertorials), as demonstrated by their making the advertorials available to affiliate marketers, at times specifically pairing them with their own Geniux Product websites (landers).  When making advertising materials available to affiliate marketers, Defendants often referred to both advertorials and landers as "offers."  Defendants distinguished offers by their names and then used the same names for these offers in emails to affiliate advertisers, in their business records, and in their affiliate marketing database, including, for example, "Lander Onyx (Black)," "Lander Fuel (Blue)," and "Geniux Advertorial (Discover)," among others.  In some instances, Defendants used offer names – such as "Geniux Advertorial (Discover) to Lander Onyx (Black)" and "Geniux Advertorial (Discover) to Lander Fuel (Blue)" – that indicated that particular sham news advertorials would link to particular Genius Product landers where consumers could purchase the Geniux Products.  In Defendants' affiliate marketing database, one offer, named

23

"Geniux Advertorial (NOT Stephen Hawking) to Desktop (FUEL) w/Mobile Redirect (Enhance)," included the following thumbnail:



***Defendants' Marketing Practices***

50.     Consumers could purchase Defendants' Geniux Products either by accessing Defendants' product websites or by calling the toll-free numbers provided on those websites. Defendants offered at least three packages:  Buy three bottles and get two free (five bottles total) with free shipping; Buy two bottles and get one free (three bottles total) with free shipping; or one Bottle Starter Package (one bottle) at a cost of $4.95 for standard shipping.

51.     In some instances, the first page of Defendants' product websites have prominently displayed a lead generation form entitled, "Tell us where to ship your advanced bottle of GENIUX."  This form seeks consumers' first and last name, full mailing address, phone number, and email address.  In some instances, consumers who completed Defendants' lead

generation forms without placing an order of Geniux Products were subsequently contacted by Defendants' outbound customer service to complete their order.

52.     Defendants' product websites promised consumers who agreed to try the Geniux Products a "100% MONEY BACK GUARANTEE" (*See* Exhs. A-C), at times reinforced with a conspicuous message that consumers could try the products "risk free," or claims that consumers could return unused portions within 30 days for a full refund:



(Exh. C at 3.)



25

(Exh. B at 9.)

53.     In some instances, during the purchase process, a small disclaimer appeared in a
separate paragraph below the "30 DAY MONEY BACK GUARANTEE" claim that contradicted
the risk-free and money-back guarantee claims.



By placing your order today you will be shipped a 30, 90 or 180 day supply of Geniux at approximately 75% off the retail price. If you feel Geniux is not for you, simply email us at support@getgeniux.com within 20 days of your order to obtain a return authorization code and return the product to us within 30 days of your first-time order and we will issue you a full refund upon the receipt of your open bottle minus shipping and handling and a $5 restocking fee. Please see Terms and Conditions for futher details.

(Excerpt from payment entry webpage during May 2016 purchase of Geniux Product from
www.geniuxmind.com.)

54.     Contrary to Defendants' express representations of a "100% money back
guarantee" and a "full refund," Defendants did not, in fact, provide a full refund to consumers.
Consumers who returned the Geniux Product received only a partial refund because they paid out
of pocket for return shipping, paid an inadequately-disclosed restock fee per bottle to
Defendants, and were not reimbursed for the original shipping and handling charges.

55.     In some instances, even when consumers returned Geniux Products in accordance
with Defendants' instructions, Defendants failed to issue refunds to such consumers, despite
reassurances from Defendants' customer service that such refunds were being processed.

56.     In other instances, Defendants employed tactics to frustrate consumers' attempts
to obtain their promised refunds.  Defendants sometimes made it difficult or nearly impossible

26

for consumers to reach customer service by phone, email, or postal mail to request a refund.  For example, Defendants' inbound customer service phone lines often rang unanswered, without an opportunity for consumers to leave a voicemail.  In other instances, consumers would send multiple emails to Defendants' customer service, to no avail.  Defendants also instructed their customer service agents to offer complaining customers only partial refunds, ranging from ten percent to fifty percent of the purchase price.  In some instances where a Return Merchandise Authorization ("RMA") number was required to initiate a refund, Defendants' customer service agents refused to provide RMA numbers to those customers.

57.     In other instances, Defendants charged consumers who ordered the Geniux Products but never fulfilled those orders.  Consumers seeking refunds for these unfulfilled orders encountered similar problems reaching customer service and/or receiving false assurances from customer service that their refunds were being processed.

58.     Defendants were aware of consumer complaints regarding billing or refunds, as well as the deceptive news format of the ads.

## VIOLATIONS OF THE FTC ACT

59.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

60.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.  Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

61.     Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics.  For the purposes of Section 12 of the FTC Act, the Geniux Products, including but not limited to Xcel, Geniux, EVO, and Ion-Z, are each either a "food" or a "drug" as defined in Section 15(b) and (c) of the FTC Act, 15 U.S.C. § 55(b), (c).

## Count I

## False or Unsubstantiated Product Claims

62.     Through the means described in Paragraphs 30, 35, and 37, Defendants have represented, directly or indirectly, expressly or by implication, that the Geniux Products:

    a.   Improve short and long term memory, increase focus, including by as much as 300 percent, and increase concentration in users;

    b.   Prevent memory loss and increase short and long term memory in persons experiencing cognitive decline because of age;

    c.   Boost brain power, including by as much as 89.2 percent;

    d.   Increase users' IQ, including by as much as 100 percent; and

    e.   Improve users' speed of information processing.

63.     The representations set forth in Paragraph 62 are false or were not substantiated at the time the representations were made.

64.     Therefore, the making of the representations as set forth in Paragraph 62 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 12.

## Count II

## False Establishment Claims

65.     Through the means described in Paragraphs 30, 35, 37 through 38, and 40, Defendants have represented, directly or indirectly, expressly or by implication, that the Geniux Products have been:

    a.  Clinically proven to increase focus, including by as much as 121 percent;

    b.  Clinically proven to increase concentration, including by as much as 312 percent;

    c.  Clinically proven to boost brain power, including by as much as 89.2 percent;

    d.  Clinically proven to enhance memory recall;

    e.  Clinically proven to increase users' IQ, including by as much as 100 percent; and

    f.  Tested in human clinical trials, including over 2,000 trials conducted by the Nottingham Clinical Trials Unit (NCTU).

66.     In truth and in fact, the Geniux Products have not been:

    a.  Clinically proven to increase focus, including by as much as 121 percent;

    b.  Clinically proven to increase concentration, including by as much as 312 percent;

    c.  Clinically proven to boost brain power, including by as much as 89.2 percent

    d.  Clinically proven to enhance memory recall;

    e.  Clinically proven to increase users' IQ, including by as much as 100 percent; or

    f.  Tested in human clinical trials, including over 2,000 trials conducted by the

Nottingham Clinical Trials Unit (NCTU).

67. Therefore, the making of the representations set forth in Paragraph 65 constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 12.

## Count III

## Other Misrepresentations

68. Through the means described in Paragraphs 33 through 35, 37 through 38, and 40 through 44, Defendants have represented, directly or indirectly, expressly or by implication, that:

a. Certain websites linking to Defendants' Geniux Product websites were objective news reports;

b. Objective news reporters have performed independent tests demonstrating the effectiveness of the Geniux Products;

c. Legitimate news sources featured the Geniux Products and their claimed effects; and

d. Celebrities depicted in advertorials for Geniux Products have endorsed the effectiveness of the Geniux Products.

69. In truth and in fact:

a. The websites linking to Defendants Geniux Product websites were advertisements made to appear as objective news reports;

b. Objective news reporters have not performed independent tests demonstrating the effectiveness of the Geniux Products;

c. Legitimate news sources have not featured the Geniux Products and their claimed effects; and

    d.   The celebrities depicted in advertorials for Geniux Products have not endorsed the effectiveness of the Geniux Products.

70.    Therefore the making of the representations as set forth in Paragraph 68 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## Count IV

### False Advertising Claims Through Consumer Endorsers

71.    Through the means described in Paragraph 45, Defendants have represented, directly or indirectly, expressly or by implication, that users featured in their advertorials were actual persons who had used Geniux Products.

72.    The representation set forth in Paragraph 71 is false or misleading.  Therefore, the making of the representation set forth in Paragraph 71 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## Count V

### False Refund and Risk-Free Claims

73.    Through the means described in Paragraphs 52 and 53, Defendants have represented to consumers, directly or indirectly, expressly or by implication, that dissatisfied consumers could return the Geniux Products and receive a full, prompt refund.

74.    Through the means described in Paragraphs 52 and 53, Defendants have represented to consumers, directly or indirectly, expressly or by implication, that they could try the Geniux Products risk-free.

75.     The representations in Paragraphs 73 and 74 are false or misleading because, to obtain a refund, Defendants required consumers to pay:  the cost of shipping and handling (except for multi-bottle purchases), which was not refundable; the out-of-pocket cost of return shipping; and a $5 restock fee per bottle.  In some instances, Defendants made it difficult, if not impossible, for consumers to reach customer service.  In other instances, Defendants frustrated customers' attempts to initiate the refund process by, for example, requiring but refusing to provide a Return Merchant Authorization number.  In other instances, Defendants failed to provide refunds to consumers who complied with their return policy or falsely represented that consumers were eligible for at most a fifty percent refund.  In other instances, Defendants charged consumers for products ordered but never fulfilled those orders and refused to provide refunds.

76.     Therefore, the making of the representations set forth in Paragraphs 73 and 74 constitute a deceptive act or practice, in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

77.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

78.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable

jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

B.      Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

C.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated: April 10, 2019             /s Kristin M. Williams
KRISTIN M. WILLIAMS
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Mailstop CC-10528
Washington, DC 20580
Tel. (202) 326-2619
kwilliams2@ftc.gov

Attorney for Plaintiff
FEDERAL TRADE COMMISSION